1  TRUJILLO RODRIGUEZ & RICHARDS, LLC
   Lisa J. Rodriguez, Esquire
2  Nicole M. Acchione, Esquire
   258 Kings Highway East
3  Haddonfield, NJ 08033
   Phone: 856-795-9002
4  Fax: 856-795-9887
   Email: lisa@trrlaw.com
5          nacchione@trrlaw.com

6
   *Attorneys for Plaintiffs*
7

8                UNITED STATES DISTRICT COURT

9                   DISTRICT OF NEW JERSEY

10

11

12  ISAAC MIKHAIL and MARLEN MIKHAIL,    )
    on behalf of themselves and all others similarly  )   No.
13  situated,                           )
14                                      )   **CLASS ACTION**
                          Plaintiffs,   )
15                                      )   **COMPLAINT FOR DAMAGES,**
              v.                        )   **RESTITUTION AND INJUNCTIVE**
16                                      )   **RELIEF**
    BANK OF AMERICA, N.A. and BAC       )
17  HOME LOANS SERVICING, LP.           )   **JURY TRIAL DEMANDED**
18                                      )
                          Defendants.   )
19  _____ )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   JURISDICTION ........................................................................................................ 5

III.  PARTIES .................................................................................................................... 5

IV.   FACTUAL BACKGROUND ................................................................................... 6

    A.   The Foreclosure Crisis ................................................................................. 6

    B.   Creation of the Home Affordable Modification Program ............................ 7

    C.   Duties of a Participating Servicer Under HAMP ........................................ 8

    D.   Plaintiffs' Effort to Obtain a Loan Modification Under HAMP ............... 14

        1.   Issac Mikhail and Marlen Mikhail ................................................ 14

    E.   Class Allegations ....................................................................................... 17

COUNT I   BREACH OF CONTRACT / BREACH OF DUTY  OF GOOD FAITH and FAIR
DEALING ................................................................................................................. 20

COUNT II   PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ............................... 22

COUNT III   VIOLATIONS OF THE NEW JERSEY Consumer Fraud Act N.J.S.A. 56:8-1 *et seq.* 22

V.   PRAYER FOR RELIEF ......................................................................................... 23

VI.  JURY TRIAL DEMANDED ................................................................................. 24

## I.    INTRODUCTION

1.    In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

2.    Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.    Bank of America signed a contract with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and included by reference) agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;
- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

CLASS ACTION COMPLAINT                    - 1 -

1             •   institute a modified loan with a reduced payment amount as per a mandated

2                formula, that is effective for a three-month trial period for borrowers that are

3                eligible for a modification; and

4             •   provide a permanently modified loan to those homeowners who comply with the

5                requirements during the trial period. Whether the homeowner qualifies for a

6                modification or not, participating servicers are also required to provide written

7                notices to every mortgage borrower that has been evaluated for a loan

8                modification, whether or not the borrower has been found eligible.

9       4.       HAMP and its associated directives also set prohibitions against certain conduct

10 including demanding upfront payments in order to be evaluated for a loan modification, instituting

11 or continuing foreclosures while a borrower is being evaluated for a loan modification, and

12 restrictions on the way a servicer may report the borrower to credit reporting agencies.

13       5.       Though Bank of America accepted $25 billion in TARP funds and entered into a

14 contract obligating itself to comply with the HAMP directives and to extend loan modifications for

15 the benefit of distressed homeowners, Bank of America has systematically failed to comply with

16 the terms of the HAMP directives and has regularly and repeatedly violated several of its

17 prohibitions.

18       6.       Under HAMP, the federal government incentivizes participating servicers to make

19 adjustments to existing mortgage obligations in order to make the monthly payments more

20 affordable. Servicers receive $1,000.00 for each HAMP modification, plus an additional $500.00

21 incentive fee if the borrower is current but facing imminent default. However, this incentive is

22 countered by a number of financial factors that make it more profitable for a mortgage servicer

23 such as Bank of America to avoid modification and to continue to keep a mortgage in a state of

24 default or distress and to push loans toward foreclosure. This is especially true in cases where the

25 mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of

26 America. On information and belief, Bank of America does not own a significant majority of the

27 loans on which it functions as a servicer.

28

7.     Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:[1]

- Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan.  This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer, collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool.  Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer.  Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan.  The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

---

[1]     *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

8.      Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.      In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, for temporary loan modifications that must be converted to permanent loan modifications.  Plaintiffs and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments.  Despite Plaintiffs' efforts, Defendants have ignored their contractual obligation to modify his loans permanently.

10.      Because Bank of America is not meeting its contractual obligations, at least hundreds, possibly thousands, of New Jersey homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America.  Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under New Jersey law.

11.      Plaintiffs Isaac Mikhail and Marlen Mikhal ("Plaintiffs") bring this suit on behalf of themselves and a class of similarly situated New Jersey residents (the "Class") to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary, Defendant BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms

of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## II.   JURISDICTION

12.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

13.    This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiff and the Class are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq.*

14.    This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of New Jersey or otherwise conduct business in the state of New Jersey.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiffs reside in this District.

## III.   PARTIES

16.    Plaintiffs Isaac Mikhail and Marlen Mikhail are a married couple residing in Hawthorne, New Jersey.

17.    Defendant Bank of America, N.A. is a mortgage lender headquartered in Charlotte, NC.  Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.. Defendants are collectively referred to as "Bank of America" and are currently doing business and maintaining office branches throughout the State of New Jersey.

# IV.    FACTUAL BACKGROUND

## A.    The Foreclosure Crisis

18.     Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

19.     New Jersey has been one of the hardest hit by the housing crisis.  New Jersey ranks tenth highest on the state foreclosure list in the United States for all of 2009.  The total number of New Jersey properties with foreclosure filings in 2009 was 63,208.  This represents a 103% increase from 2007.[3]

20.     In the first half of 2010, over 1.65 million properties in the United States received foreclosure notices.  The total number of New Jersey properties receiving foreclosure filings in the first half of 2010 totaled 36,542, again putting New Jersey in the top ten highest states for foreclosure filings.[4]

21.     Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

---

[2]     Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report100909-cop.cfin.

[3]     http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333

[4]     http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=219663&itemid=9555&utm.

**B.    Creation of the Home Affordable Modification Program**

22.    Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A § 5201 et seq. (2009).

*23.*    The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  *Id.*

24.    The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.  *Id.*

25.    Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

26.    In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

27.    The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id.*

28.    The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

29.    On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

30.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

31.     The second subprogram relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

32.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C.      Duties of a Participating Servicer Under HAMP**

33.     Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government.  A copy of this SPA is attached as Ex. 1.

34.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA I.A., 2.A.[5]

---

[5]     The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  A summary of the guidelines for the Making Home Affordable program are attached hereto as Exhibit 7.  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiff (except for Exhibit 7) as well as herein (including Exhibit 7).

CLASS ACTION COMPLAINT                          - 8 -

35.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." Ex. 2 at p. 1.  This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments." *Id.*

36.     The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. *Id.* at p. 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. *Id.* at pp. 3-4.

37.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").  Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[6]

38.     A mortgage is eligible for the HAMP if criteria enumerated in the Program Documentation are met.  Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income. *Id.* at p. 2.

---

[6]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

39.     The servicer must "provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions." *Id.* at p. 13.

40.     Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the Program Directives place duties on the servicer to take specified actions for the benefit of the eligible homeowner.   The servicer must apply the modification steps enumerated in the Program Documentation, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *See* Ex. 2 at pp. 8-10; *see also* Ex. 3 at p. 2.

41.     After applying the enumerated modification steps to calculate the modified payment amount, a servicer must offer the borrower a TPP.  The TPP consists of a three-month period (four months for loans that are current, but facing imminent default) in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. Bank of America uses a standard form agreement to offer TPPs to eligible homeowners.  This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

42.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three (or four, if default is imminent) TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification.  The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market

Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.  *See* Ex. 2 at p. 9.

43.     Subject to minor adjustments that can be made to account for changes in the income as documented and verified, HAMP directes that the terms of the Trial Plan automatically made permanent upon a homeowners successful completion of the Plan.  SD 09-01 states that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan."  Ex. 2 at p. 18.

44.     HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options.  *See* Ex. 4 at Q63; *see also* Ex. 2 at p. 14.

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts.  Ex. 4 at Q. 83.

- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.  Ex. 8 at Q1230-02.

- Reporting borrowers as delinquent to credit reporting bureaus without explanation.  For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.  For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status.  Ex. 2 at p. 22.

- Assessing prepayment penalties for full or partial prepayment as part of the modification.  Ex. 4 at Q. 25.

45.     The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.  Ex. 5 at p. 1.

46.     The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

Ex. 8 at Q1222-01.

47.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.  Ex. 1 at ¶ 5(b).

48.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than that which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.  *Id.* at ¶ 5(d).

49.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information.  Borrowers who attempt to contact

Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

50. .   Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The January 2010 Treasury Report is attached hereto as Exhibit 6.

51.   In June 2010, based on figures provided by Bank of America, the Treasury Department revised its figure regarding potential HAMP-eligible loans in Bank of America's portfolio down to 478,811.  The Treasury Department reported that Bank of America completed only 62,969 permanent modifications. [7]  Even with the number of HAMP eligible loans more than halved from the January 2010 report, Bank of America has provided permanent modifications to only 13% of its eligible pool – which is among the worst performance of any major servicer.  The May 2010 Treasury Report is attached hereto as Exhibit 9.

52.   By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

---

[7] Bank of America reported that it had completed over 70,000 permanent modifications through May 27, 2010.  The Treasury Department, however, reported that Bank of America completed only 62,969, a discrepancy which Bank of America attributed to an uploading error.  No other servicers reported problems uploading their information for Treasury's May 2010 report.

**D.      Plaintiffs' Effort to Obtain a Loan Modification Under HAMP**

     **1.      Issac Mikhail and Marlen Mikhail**

53.      Plaintiffs Issac Mikhail and Marlen Mikhail purchased their home in 2001 in which they live with their two children and Mr. Mikhail's mother.  The mortgage loan and title to the property is in both Mr. Mikhail and Mrs. Mikhail's names.  In 2005, the Mikhail's refinanced their mortgage to a 20-year term which was transferred to Bank of America via Countywide Mortgage.  The Mikhail's mortgage payment, which was always paid on time, was $1,857.30 due each month, excluding taxes.

54.      Mrs. Mikhail works for TD Bank as a Customer Service Representative.  Mr. Mikhail was a store manager at a Thomasville Furniture Store.

55.      In June 2007, Mr. Mikhail was injured but returned to work within two weeks.  In July 2008, a relapse of his injury forced Mr. Mikhail to have surgery.  Mr. Mikhail was determined fully disabled in December 2008, requiring him to live off disability benefits of $1,612.00 per month, a dramatic reduction in the family income.

56.      In late August 2009, Mr. Mikhail called Bank of America and requested that it modify the Mikhail's mortgage.  Mr. Mikhail was at this time informed that he would shortly be receiving a package from Bank of America in the mail.

57.      Mr. Mikhail repeatedly called Bank of America and was finally able to garner a phone interview on or about September 7, 2009, when he spoke with a representative named Ken Austin.  The interview mostly involved Mr. Austin asking Mr. Mikhai about his and his wife's monthly expenses.

58.      Mr. Mikhail had another phone interview with Bank of America on September 14, 2009, this time with a representative named Chris Conry.  As with the first phone interview, this phone interview mostly involved Mr. Conry interview asking Mr. Mikhai about his and his wife's monthly expenses.

59.      By letter dated November 20, 2009, the Mikhail's were informed by Bank of America that they would be accepted into a TPP.  The Mikhail's received this letter via Federal

Express on December 1, 2009. The letter informed the Mikhail's that they were approved for a new four month trial period with a monthly payment of $1,238.54. The letter also stated that if the Mikhail's were compliant with the trial period requirements, their loan would be permanently modified at a reduced rate. Specifically, the letter stated, in part:

> You let us know that it is becoming increasingly difficult for you to make your mortgage payment. We want to help you stay in your home. Under the federal government's Home Affordable Mortgage Program, we may be able to provide you a more affordable mortgage.

> Instead of making your existing mortgage payment, you will now make the new four-month trial period mortgage payment of $1,238.54.. [sic]

> **After making your first month's trial period payment, you must return the requested documents and enclosed forms** so we can confirm your eligibility for the trial period plan. ... You will need to send the following information:

> - Signed Mortgage Servicer copies of the **Home Affordable Modification Trial Period Plan.**
> - The **Hardship Affidavit** completed and signed by each borrower.
> - A completed, signed and dated copy of the most **recent tax return** for each borrower.
> - The **Freddie Mac Form 1126**, where you provide your financial information.
> - **Documentation to verify** all of the **income** of each borrower – exact required documentation is found on the enclosed checklist.

> **There are no fees associated with this program** ....

Letter from Matt Skoglund, Senior Vice President, National Servicing Executive, BAC Home Loans Servicing, LP to Isaac and Marlen Mikhail, dated Nov. 20, 2009, attached hereto as Exhibit 10 (emphasis in original).

     60.     Enclosed with the letter was a Home Affordable Trial Period Plan that set forth terms consistent with the letter. This document opens by stating:

> If I am in compliance with this Trial Period (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend tand

supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

*Id.*

61.     The Mikhails made all the payments itemized in the Trial Period Plan in full and on time.  The representations they made in Section 1 of the Trial Period Plan remained true in all material respects.

62.     The Mikhails provided Bank of America with all documents it requested.

63.     After fully complying with the terms of the Trial Period Plan, and having heard nothing more, Mr. Mikhail called Bank of America.  Its representative, David Corey, confirmed that the Mikhail's were compliant and Mr. Mikhail confirmed that he would continue making payments under the TPP.

64.     Throughout May and June, 2010, Mr. Mikhail again called Bank of America several times.  Invariably he spent long periods on hold and was transferred multiple times during each call.  On multiple occasions, Bank of America representatives informed Mr. Mikhail that Bank of America would require him to send copies of documents he had previously sent.  For example, Mr. Mikhail was required to submit the same copy of his tax return and Social Security benefit letter no fewer than three separate times.  Mr. Mikhail submitted all documents requested of him with each request.  On at least three occasions, a Bank of America representative confirmed that Bank of America had received all required documents.

65.     On July 9, 2010, the Mikhail's received a letter notifying them that Bank of America had rejected their request for loan modification due to the Mikhail's failure to provide requested documentation.  Specifically, the letter stated:

> We have reviewed your request for a loan modification under the federal government's Home Affordable Modification Program. Unfortunately, your loan is not eligible for a Home Affordable Modification for the reason stated below.
>
> *         *         *
>
> **Request Incomplete.**   Your loan is not eligible for a Home Affordable Modification because you did not provide us with the documents we requested.   A notice which listed the specific documents we needed and the time frame required to provide them

was sent to you more than 30 days ago.  We have have also sent you additional notices about missing or incomplete required documents.

We strongly encourage you to continue making the normal monthly payments under your original loan documents to help avoid foreclosure.

Letter from BAC Home Loans Servicing, LP to Isaac and Marlen Mikhail, dated July 9, 2010 (emphasis in original), a copy of which is attached hereto as Exhibit 11.

66.   Despite compliance with all of Bank of America's instructions, and all responsibilities under the terms of the HAMP directives, the Mikahil's were not provided a Loan Modification Agreement under the HAMP guidelines.

67.   The Mikhail's have spent significant time in efforts to modify this loan with Bank of America including but not limited to dozens of hours on the telephone.

68.   Despite compliance with all of Bank of America's instructions, and all responsibilities under the terms of the HAMP directives, the Mikhail's are now required to make monthly mortgage payments under the original terms of their loan, approximately $620 more per month than under the TPP.  Nevertheless, because of the Mikhail's financial difficulties, after the rejection of their HAMP application, the Mikhail's continued to make a mortgage payment under the terms of their TPP.

69.   Despite full compliance with the Trial Period Plan and all of Bank of America's instructions, Bank of America has made derogatory reports regarding the Mikhails to credit reporting agencies thereby damaging their credit.

70.   Like hundreds or even thousands of New Jersey residents, the Mikhails have been living in limbo, without any assurances that their home will not be foreclosed, despite compliance with HAMP requirements and continued monthly payments under the agreement dictated by Bank of America.  They have invested his limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

**E.   Class Allegations**

71.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

72.     Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

> All New Jersey homeowners whose loans have been serviced by one or both Defendants and who, since April 13, 2009, have requested or been otherwise eligible for a TPP under the terms of HAMP Program Documentation and whose loan Bank of America has not permanently modified either because Bank of America has not offered them a TPP, because they did not receive a permanent loan modification after they complied with their obligations under HAMP as conveyed to them by Bank of America, or because Bank of America has not honored the terms of a permanent modification agreement.

73.     Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former officers, directors, agents, representatives, their family members, Defendants' current employees, the members of this Court and its staff.

74.     Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records.  Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

75.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

76.     All members of the Class have been subject to and affected by the same conduct. The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

    a.     The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

    b.     Whether Bank of America breached its duties under HAMP that were intended for the benefit of Class members;

1        c.    Whether the manner in which Bank of America has executed the duties it

2                undertook as part of the HAMP program violates its duty of good faith and

3                fair dealing;

4        d.    Whether Bank of America's receipt of an executed TPP Agreement, along

5                with supporting documentation and three monthly payments, creates a

6                binding contract or otherwise legally obligates Bank of America to offer

7                Class members a permanent HAMP modification;

8        e.    Whether Bank of America's failure to provide permanent HAMP

9                modifications in these circumstances amounts to a breach of contract and/or

10              a breach of the covenant of good faith and fair dealing;

11        f.    Whether Bank of America demanded and collected initial payments from

12              eligible homeowners in violation of HAMP provisions;

13        g.    Whether Bank of America's written representations to homeowners stating

14              that they would receive permanent loan modifications upon successful

15              completion of the trial period and then failing to deliver such permanent

16              modification constitutes an unfair or deceptive practice under the New

17              Jersey Consumer Fraud Act ("CFA");

18        j.    Whether the above practices caused Class members to suffer injury; and

19        k.    The proper measure of damages and the appropriate injunctive relief.

20     77.    The claims of the individual named Plaintiffs are typical of the claims of the Class

21 and do not conflict with the interests of any other members of the Class in that both the Plaintiffs

22 and the other members of the Class were subject to the same conduct, were subject to the terms of

23 the same agreement and were met with the same absence of a permanent modification.

24     78.    The individual named Plaintiffs will fairly and adequately represent the interests of

25 the Class.  He is committed to the vigorous prosecution of the Class's claims and has retained

26 attorneys who are qualified to pursue this litigation and have experience in class actions – in

27 particular, consumer protection actions.

28

79.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

80.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

81.     Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**COUNT I**

**BREACH OF CONTRACT / BREACH OF DUTY**
**OF GOOD FAITH AND FAIR DEALING**

82.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

83.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

84.     The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs and the Class.

85.     By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

86.     Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

87.     In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

88.     The Agreement sent by Bank of America to Plaintiffs constitutes a valid offer.

89.     By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiffs accepted Bank of America's offer.

90.     Alternatively, Plaintiffs' return of the Agreement constitutes an offer.  Acceptance of this offer occurred when Bank of America accepted Plaintiffs' TPP payments.

91.     Plaintiffs' TPP payments to Bank of America constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

92.     Plaintiffs and Bank of America thereby formed a valid contract.

93.     To the extent that the contract was subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiffs' claims.

94.     By failing to offer Plaintiffs a permanent HAMP modification, Bank of America breached that contract.

95.     Bank of America routinely and regularly breached its duties under both the SPA and their contract with the individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and failing to follow through on oral, written and implied promises.

96.     Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

97.     Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach.  By making TPP payments both during and after the TPP period, Plaintiffs foregoed other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

### PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

98. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

99. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

100. Bank of America, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made his TPP payments, they would receive a permanent HAMP modification.

101. Bank of America's TPP Agreement was intended to induce Plaintiffs to rely on it and make monthly TPP payments.

102. Plaintiffs did indeed rely on Bank of America's representation, by submitting TPP payments.

103. Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

104. Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive permanent HAMP modifications and have lost the opportunity to fund other strategies to deal with his default and avoid foreclosure.

### COUNT III

### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD
### ACT N.J.S.A. 56:8-1 *ET SEQ.*

105. Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

106. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

107. Plaintiffs, Class members and defendants are "persons" within the meaning of the CFA.

108. At all relevant times material hereto, defendants conducted trade and commerce in New Jersey within the meaning of the CFA.

1    109.    The conduct of Bank of America as set forth herein constitutes an unconscionable

2    commercial practice comprised of unfair or deceptive acts or practices in violation of the CFA,

3    including its practice of leading borrowers, including, but not limited to, Plaintiffs, to believe that

4    they will permanently modify their mortgage loans upon successful completion of a trial program.

5    110.    Bank of America's conduct as set forth herein has been unfair in violation of the

6    CFA because the acts or practices violate established public policy, and because the harm they

7    cause to consumers in New Jersey greatly outweighs any benefits associated with those practices.

8    111.    Bank of America's conduct as set forth herein resulted in loss of money or property

9    to Plaintiffs and Class members.

10                            V.       **PRAYER FOR RELIEF**

11   WHEREFORE, the Plaintiffs respectfully request the following relief:

12   A.    Certify this case as a class action and appoint the named Plaintiffs to be Class

13   representatives and their counsel to be Class counsel;

14   B.    Enter a judgment declaring the acts and practices of Bank of America complained of

15   herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing,

16   as well as a declaration that they are required by the doctrine of promissory estoppel to offer

17   permanent modifications to Class members;

18   C.    Grant a permanent or final injunction enjoining Bank of America's agents and

19   employees, affiliates and subsidiaries from continuing to harm Plaintiffs and the members of the

20   Class;

21   D.    Order Bank of America to adopt and enforce a policy that requires appropriate

22   training of their employees and agents regarding their duties under HAMP;

23   E.    Order specific performance of Bank of America's contractual obligations together

24   with other relief required by contract and law;

25   F.    Reduce the amount of indebtedness of Plaintiffs and each Class member by the

26   amounts Defendants have wrongfully claimed to be owed due to payment amounts, interest and

27   fees, that do not comply with HAMP or with contracts directly with Plaintiffs or Class members;

28

1    G.    Award restitution as wells as actual and statutory damages, including, but not

2  limited to treble damages, to the Plaintiffs and the Class in amounts to be proven at trial;

3    H.    Award Plaintiffs the costs of this action, including the fees and costs of experts,

4  together with reasonable attorneys' fees; and

5    I.    Grant Plaintiffs and the Class such other and further relief as this Court finds

6  necessary and proper.

<b>VI.    JURY TRIAL DEMANDED</b>

8    Plaintiffs demand a trial by jury on all issues so triable.

9  DATED:  July 19, 2010

TRUJILLO RODRIGUEZ & RICHARDS, LLC

By:   s/ Lisa J. Rodriguez
      Lisa J. Rodriguez, Esquire
      Nicole M. Acchione, Esquire
      258 Kings Highway East
      Haddonfield, NJ 08033
      Tel: 856-795-9002
      Fax: 856-795-9887
      Email: lisa@trrlaw.com
            nacchione@trrlaw.com

      Anthony J. Bolognese
      Joshua H. Grabar
      Jonathan M. Stemerman
      BOLOGNESE & ASSOCIATES, LLC
      Two Penn Center
      1500 John F. Kennedy Blvd., Ste. 320
      Philadelphia, PA  19102
      Tel: (215) 814-6750
      Fax: (215) 814-6764
      Email: abolognese@bolognese-law.com
      Email: jgrabar@bolognese-law.com
      Email: jstemerman@bolognese-law.com

      *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT                    - 24 -